## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WARREN CIRAVOLA**                                                                 **CIVIL ACTION**

**VERSUS**                                                                                        **NO. 19-10837**

**DARREL VANNOY, WARDEN**                                              **SECTION: "I"(3)**


### REPORT AND RECOMMENDATION

Petitioner, Warren Ciravola, a Louisiana state prisoner, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On July 10, 2014, petitioner was convicted of aggravated incest and aggravated rape under Louisiana law.[1] On August 13, 2014, he was sentenced as follows: on the aggravated incest conviction, to a term of fifty years imprisonment, with the first twenty-five years of that sentence to be served without benefit of probation, parole, or suspension of sentence; and on the aggravated rape conviction, to a term of life imprisonment, with the entire term of that sentence to be served without benefit of probation, parole, or suspension of sentence. It was ordered that those sentences be served consecutively.[2] On August 5, 2015, the Louisiana First Circuit Court of Appeal affirmed petitioner's convictions and sentences,[3] and the Louisiana Supreme Court denied his related writ application on September 6, 2017.[4]

---

[1] State Rec., Vol. 4 of 8, trial transcript, pp. 717-18; State Rec., Vol. 1 of 8, minute entry dated July 10, 2014.

[2] State Rec., Vol. 4 of 8, transcript of August 13, 2014; State Rec., Vol. 1 of 8, minute entry dated August 13, 2014.

[3] State v. Ciravola, No. 2015 KA 0032, 2015 WL 4657546 (La. App. 1st Cir. Aug. 5, 2015); State Rec., Vol. 4 of 8. The Court of Appeal did, however, correct petitioner's fifty year sentence to specify that it was to be served at hard labor.

[4] State v. Ciravola, 226 So. 3d 434 (La. 2017); State Rec., Vol. 6 of 8.

On February 7, 2018, petitioner filed an application for post-conviction relief with the state district court.[5]  That application was denied on March 22, 2018.[6]  His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on June 4, 2018,[7] and by the Louisiana Supreme Court on May 20, 2019.[8]

On May 28, 2019, petitioner filed the instant federal application seeking habeas corpus relief.[9]  The state filed a response conceding that the application is timely and that petitioner's remedies in the state courts are exhausted; however, the state nevertheless argued that petitioner's claims should be denied.[10]  Petitioner filed a reply to the state's response.[11]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).

---

[5] State Rec., Vol. 5 of 8.
[6] State Rec., Vol. 5 of 8, Order dated March 22, 2018.
[7] State v. Ciravola, No. 2018 KW 0509, 2018 WL 2714915 (La. App. 1st Cir. June 4, 2018); State Rec., Vol. 7 of 8.
[8] State v. Ciravola, 271 So. 3d 1266 (La. 2019); State Rec., Vol. 8 of 8.
[9] Rec. Doc. 1.
[10] Rec. Doc. 13.
[11] Rec. Doc. 14.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

In summary, "AEDPA prevents defendants – *and federal courts* – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this

case as follows:

> In January 2013, C.B., the twelve-year-old victim, was injured during physical education class.[FN 3]  Her mother picked her up from school and brought her to the emergency room, where they learned that she was seven to eight months pregnant.  The following day, Pauline Bankston, the principal at the victim's school, spoke with the victim, and the victim stated that her baby was due in March 2013, that she hoped it was born on the defendant's birthday, and that she was going to name her baby after the defendant, her father.  A few weeks later, Bankston received a report from a paraprofessional at the school that R.C., one of the victim's classmates, disclosed that she saw the victim and the defendant at a parade.  According to R.C., the victim stated that the defendant was the father of the baby.  Bankston reported this information to the Department of Children and Family Services ("DCFS") and the Washington Parish Rape Crisis Center.

> > [FN 3]  Initials are being used to protect the identity of the minor victim and other minors involved.  See La. R.S. 46:1844W.

> The following month, DCFS investigator Felicia Hillhouse was notified that the victim missed an appointment with her doctor, was not stating the identity of her unborn child's father, and lived in a home that was inadequate care [sic] for a baby.  Based on that information, on February 14, 2013, Hillhouse reported to the victim's school and learned that the victim had started the parish school board's homebound program.  Hillhouse and Michelle Green, also with DCFS, then drove to the victim's home where she lived with her mother and the defendant.  The two investigators arrived between 1:00 and 2:00 p.m., and the defendant answered the door approximately two minutes after Hillhouse initially knocked.  He exited onto the steps of the home and told Hillhouse that she could not enter because he was in the process of cleaning.  Hillhouse testified that the defendant was wearing an almost knee-length dark blue terrycloth robe and had an erection.  As the defendant sat on the steps to speak with Hillhouse, he continually pulled his robe closed and crossed his legs.  Hillhouse saw the victim peek outside of the window and asked the defendant who she was.  The defendant stated that she was his daughter.  When asked where his wife was, the defendant stated that she was at work.  Hillhouse and the defendant talked on the porch for ten or fifteen minutes, and although she asked to enter the home four times, the defendant refused.

> While talking outside, Hillhouse and the defendant discussed the victim's pregnancy.  The defendant stated that the victim was never around other men, so he did not know the identity of the unborn child's father.  He stated that he planned to let the police handle the situation and that the offender should be incarcerated.

Hillhouse assured the defendant that whoever fathered the child would be incarcerated and opined that other criminals do not "take kindly" to inmates who have hurt or molested a child. According to Hillhouse, when she made that statement, the defendant's facial expression "dropped," and he looked at her in a completely different way before backing up, telling her to have a good day, and returning inside. After she left the victim's home, Hillhouse contacted the police who met and escorted her back to the home twenty or twenty-five minutes after the initial visit. The defendant walked outside, still wearing his robe, but did not appear to have an erection. He allowed Hillhouse to enter the home, where she observed the victim was sitting on a couch in the living room with a blanket pulled up to her waist. The victim was wearing a long white T-shirt that she stated belonged to the defendant. She was wearing a black zip-up "hoodie" over the Tshirt, and her legs were bare. After Hillhouse instructed the victim to get up and get dressed, the victim leaned down and picked up a pair of underwear from the floor beside the couch. The victim then walked through the living room with the underwear and entered the bathroom. The defendant attempted to follow the victim, but was told that he could not.

Hillhouse saw clothes piled in the victim's room as well as on both of the couches in the living room. When asked where the victim slept, the defendant stated that she slept on the couch. When it was pointed out to him that the couch was full of clothes, the defendant explained that the victim also slept in the bed with him and her mother. He also explained that the victim's bathroom was not in working condition, so she used her parents' bathroom.

Hillhouse took the victim into custody, drove her to the DCFS office in Bogalusa, and asked whether she would be surprised to hear that it was reported that she stated that the defendant was the father of her baby. According to Hillhouse, the victim had been crying prior to that question, but when that was asked, she put her head down and began sobbing. That same day, the victim was taken to a hospital in Bogalusa for a rape examination and placed with foster parent, Ada Horton, where she still resided at the time of trial. The victim did not disclose to Hillhouse the identity of the father of her unborn child.

Washington Parish Sheriff's Office Captain Tommie Sorrell took over the investigation and learned that the defendant had been identified as a suspect. Captain Sorrell met with the victim and her mother on February 15, 2013. Captain Sorrell first met with the victim's mother and informed her that she believed that DCFS interrupted the victim and the defendant engaging in sexual intercourse. When confronted with this information, the victim's mother did not show "a whole lot of emotion" but stated that she did not "want to think that this could happen." According to Captain Sorrell, the victim did not want to name the father of the baby until Captain Sorrell told the victim that Captain Sorrell believed that the victim and the defendant were having sexual intercourse when DCFS workers arrived at their home the day prior and that the defendant was the father of the victim's unborn child. After Captain Sorrell made that statement, the victim broke down, began crying, and "went into hysterics." The victim continually stated, "It's not my

father's baby."  The victim finally whispered in the ear of Melissa Creel, who was representing Washington Parish Rape Crisis Center, that her cousin, B.C.,[FN 4] was the father.

[FN 4]  B.C. was born on April 9, 1999.

Captain Sorrell asked the victim whether she understood the reproductive process and the male and female body parts.  The victim indicated that she did understand and explained that she called a penis a "wheedle."  She explained in a very nonchalant and childlike manner that often, just for fun, the defendant would run around naked, and she would see his "wheedle."

Captain Sorrell spoke with the victim's mother who stated that she thought the father was B.C. or B.C.'s father and that she also suspected that the defendant could be the father and had even questioned him on the matter.  The defendant reported to the police station in order to give a DNA sample.  While at the police station, Captain Sorrell told the defendant that his wife stated that she thought he may be the father.  The defendant walked out and yelled at his wife in the station's lobby asking, "Did you tell them that you thought I fathered the baby?"  Captain Sorrell witnessed the encounter and testified that the defendant yelled at his wife to the point that she and two investigators got up to make sure everyone was okay in the lobby.

The victim was interviewed by JoBeth Rickels with the Children's Advocacy Center ("CAC") on April 5, 2013.[FN 5]  During the interview, the victim explained that the defendant was in jail because of the February 14, 2013 encounter with DCFS.  She stated that the DCFS workers said she picked up a pair of underwear from the living room floor, but she actually picked up her bra and went into her parents' bathroom and put on the bra.  The victim told Rickels that she retrieved the underwear in question from the bathroom and put them on.  She stated that the defendant was in the bathroom before she entered, but she was unsure how his sperm, which was later discovered on the crotch area of the victim's underwear, were transferred to the underwear.

[FN 5]  The victim was previously interviewed by Rickels on January 24, 2013, in reference to rape allegations against one of her uncles, Shane, who was incarcerated in 2005.

The victim told Rickels that the abuse by Shane occurred when she was eleven years old, and other than Shane, the only person that she had sexual intercourse with was B.C.  She claimed that she had sexual intercourse with B.C. four times, all of which occurred either in her bedroom or the living room of her home.  The victim stated it happened for the first time when she was eleven years old, and the last time that it happened was February 2013.  She stated that she was pregnant during their last encounter, but B.C. did not know.

Rickels asked the victim about their first conversation, before the victim's baby was born and reminded her that she indicated that she thought Shane was the father. The victim admitted that that statement was a lie, but said at first, she did think Shane was the father, but after she thought back, she realized that the father was B.C. However, the victim also stated in her interview that she realized that B.C. was the father when she received the DNA results. She stated that when she received this information, she "was relieved it wasn't [the defendant], but kinda upset that it was [B.C.]." Rickels asked the victim how the defendant could be the father, and the victim responded by stating that although everyone kept saying that the defendant was the father, she knew that he was not. She told Rickels that the baby could only have been fathered by B.C. or Shane. The victim told Rickels that her father did not "do anything to her" and that he always calls her his "baby girl." She explained that all she did with her father was play PlayStation games and attend concerts and that her mother was always present.

According to Rickels, children do not always immediately disclose abuse. She explained that the type of relationship a child has with his or her perpetrator affects their willingness to disclose. Rickels explained the child may feel conflicted because although the child does not like the abuse, the perpetrator may be someone the child loves or likes to be with.

According to Captain Sorrell, the victim's accounts of her sexual encounters with B.C. were inconsistent. The first time that she spoke with the victim, the victim disclosed that B.C. raped her one time, and she could not give any additional details. In other conversations with Captain Sorrell, the victim stated that B.C. raped her four times. On the date of her CAC interview, the victim told Captain Sorrell that the incidents occurred in four different locations, but when the victim met with Rickels, although she maintained that she was raped by B.C. four times, she gave four completely different locations. Captain Sorrell interviewed B.C. who admitted having sexual intercourse with the victim. He stated that the victim always instigated the contact, and he gave the locations in the house where they had sexual intercourse and stated that it happened more than five, but less than ten times. On cross-examination, Captain Sorrell opined that the victim was socialized to think this was acceptable behavior, and when she was confronted and realized that the behavior went against the societal norm, she became embarrassed.

Louisiana State Police Crime Lab DNA analyst Andrew Ingram tested the underwear and samples collected from the victim during her sexual assault examination. He also received reference samples from the defendant, B.C., B.C.'s father, and the victim's baby. The results indicated that B.C. could not be excluded as the father of the baby. Two stains on the victim's underwear were tested. The DNA profile obtained from the epithelial fraction of Stain T-2 from the underwear was consistent with the DNA profile obtained from the reference sample of the victim, but there was insufficient DNA in the sperm fraction to produce a valid profile. With regard to Stain T-1, the DNA profile obtained from the epithelial fraction of the stain located on the victim's underwear was consistent with the DNA profile obtained from the victim, and the sperm fraction of that stain was consistent

with being a mixture of DNA from two individuals, with one major and one minor contributor. The victim could not be excluded as the major contributor to the profile, and the defendant could not be excluded as the minor contributor to the profile. According to the results, both B.C. and B.C.'s father could be excluded as the minor contributor. Assuming two contributors, the deduced DNA profile was 87.5 thousand times for the Caucasian population, 426,000 times for the black population, and 757,000 times for the southwestern Hispanic population, more likely to be observed if it had originated from a mixture of DNA from the victim and the defendant than if it had originated from the victim and an unknown, unrelated individual.

Based on the disclosure by R.C. and the defendant's DNA located on the crotch area of the victim's underwear, a warrant was obtained for the defendant's arrest, and he was arrested on March 14, 2013. After the baby was born and it was determined that the defendant was not the father, the victim told Captain Sorrell that she was "relieved." When asked how she could explain the fact that the defendant's semen was located on her underwear, the victim stated that her underwear must have been left on the bathroom floor and kept repeating, "It's not my daddy's baby. I told you it wasn't my daddy's baby. I haven't had sex with my dad. He hasn't hurt me."

D.D., another child living with the victim's foster mother, testified that she had a conversation with the victim prior to the birth of the victim's baby. According to D.D., the victim was calm at first, but she started crying a little and stated that the defendant did not rape her, but that "it was given up, and that she wanted the baby to be for her dad and that she didn't think he should be prosecuted because he didn't pretty much do anything, she let it happen[.]" D.D. reported this information to her foster mother, Ada Horton. Horton testified that D.D. told her that the victim stated, "Everybody is saying that my daddy raped me, but I gave it to him." According to Horton, D.D. was very concerned. D.D. testified that after the victim found out that the defendant was not the father, she was "kind of upset." D.D. stated that the victim came in her room, began crying, and stated, "I wanted my dad to be the father, not my cousin."

At the time of trial, the victim was thirteen years old and in the eighth grade. The victim denied that her father touched her inappropriately or had sexual contact with her. However, she admitted that she told Captain Sorrell that she was "relieved" when she learned that B.C., and not the defendant, was the father of her baby. The victim admitted that she saw R.C. at a parade in February 2013, but denied telling R.C. that she was "pregnant for her dad." The victim's account of the day that she was taken into custody was slightly different than that of Hillhouse. According to the victim, while her mother was at work, she and the defendant were cleaning the house. She denied looking outside of the window while the defendant and Hillhouse spoke during Hillhouse's first visit. She testified that she was cleaning her room when DCFS returned with a police officer, and she was told to sit on the couch because she should not have been cleaning. According to the victim, her father was wearing a navy-blue ankle-length robe, and she was wearing

long pants when DCFS arrived. She claimed that she was also wearing the underwear at issue and had slept in them the night before. The victim denied picking up any clothing or underwear from the living room floor when she was told to get dressed. She also claimed that she did not recall telling Rickels that she picked up a bra from the living room floor and put on her underwear in her parents' bathroom.

According to the victim's testimony, she had a conversation with her mother after she found out that she was pregnant, and her mother asked if the defendant may be the father. The victim stated that she told her mother the defendant was not the father. The victim testified that she remembers D.D. asking whether the defendant "took it from [her]" but claimed that she did not tell D.D. that she "gave it up to him." The victim denied telling D.D. that she was disappointed that the defendant was not the father. She also denied telling Captain Sorrell that the defendant would sometimes run around naked as a joke. She did not know how the defendant's sperm got on her underwear.

On cross-examination, the victim insisted that she never had sexual intercourse with the defendant, and that the defendant never touched her inappropriately. She denied telling her counselor that she had sexual contact with her dad. The victim stated that when they learned that she was pregnant, her mother asked if the defendant could be the father. She explained that she was "relieved" that the defendant was not the father, not because she thought he was the father, but because the gossip that the defendant was the father would end. She explained that the underwear that she was wearing on the day that DCFS took her into custody were the same pair she slept in the night before. She initially stated that they were clean and that she got them out of the laundry room, but then said that she may have grabbed them out of the dirty clothes basket.

After the State rested its case, the defendant recalled the victim. She explained that she told D.D. that she wanted the baby to be raised by the defendant, not that the defendant was the father of the baby, and indicating that she wished the baby was from her father, she could have meant that she wanted the defendant to raise the baby.

The defendant testified at trial. He claimed that DCFS arrived at his house around 8:00 a.m. on the day the victim was taken into custody. According to the defendant's testimony, when he opened the door, he was wearing a blue robe with boxer shorts underneath and did not have an erection. The defendant claimed that when Hillhouse returned, the victim was inside her room sitting on a beanbag chair or cleaning. He denied stating that the victim sometimes slept in his room.

The defendant claimed that the victim told him that "Bernard" was the father of the baby, and he thought she was referring to his brother, B.C.'s father. According to the defendant, his wife did not inquire whether he was the father of the victim's baby, and his wife denied making that statement to Captain Sorrell. The defendant denied yelling at his wife in the police station lobby.

The defendant denied having sexual intercourse with the victim, stating that the victim was his "baby girl," his "heart and [his] soul." When he was asked about

10

the fact that his sperm was located on the crotch area of a pair of underwear worn by the victim on the day she was removed from the home, he agreed that the underwear belonged to the victim and gave an explanation.  According to the defendant, he and his wife had sexual intercourse in their bathroom a few times, and he grabbed articles of clothing and wiped her.  He stated that the underwear at issue could be the article of clothing that he grabbed in one of those instances.[12]

### III.  Petitioner's Claims[13]

#### A.  Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support his convictions.  On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant argues that the State failed to prove beyond a reasonable doubt that he was guilty of the aggravated rape and aggravated incest of the victim.
>
> In reviewing the sufficiency of the evidence to support a conviction, a Louisiana appellate court is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  That standard of appellate review, adopted by the legislature in enacting Louisiana Code of Criminal Procedure article 821 (pertaining to motions for post-verdict judgment of acquittal based on insufficiency of evidence), is whether the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.  See State v. Brown, 2003-0897 (La. 4/12/05), 907 So.2d 1, 18, cert. denied, 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006).  The Jackson standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  When analyzing circumstantial evidence, Louisiana Revised Statute 15:438 provides that, in order to convict, the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.  State v. Patorno, 2001-2585 (La.App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
>
> When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.  When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.  State v. Wright, 98-0601 (La.App. 1st. Cir. 2/19/99), 730

---

[12] State v. Ciravola, No. 2015 KA 0032, 2015 WL 4657546, at *1-7 (La. App. 1st Cir. Aug. 5, 2015); State Rec., Vol. 4 of 8.

[13] For ease of analysis, petitioner's claims are discussed in a different order than they were listed in his federal application.

So.2d 485, 487, <u>writs denied</u>, 99-0802 (La.10/29/99), 748 So.2d 1157 and 2000-0895 (La. 11/17/00), 773 So.2d 732.

Rape is defined as the act of anal, oral, or vaginal sexual intercourse with a person without the person's lawful consent. La. R.S. 14:41A. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime. La. R.S. 14:41B. Oral sexual intercourse is defined as the intentional engaging in any of the following acts with another person: (1) the touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender; (2) the touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim. La. R.S. 14:41C. Aggravated rape is defined, in pertinent part, as a rape committed where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of thirteen. La. R.S. 14:42A(4).

Louisiana Revised Statutes 14:78.1 (prior to its repeal 2014) provided, in pertinent part:

> A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child....

> B. The following are prohibited acts under this Section:

> (1) Sexual intercourse, sexual battery, ... carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, ... crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.

> (2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

At trial, Hillhouse testified that when she arrived at the defendant's home, he answered the door wearing a short robe, had an erection, and refused to let her inside. She saw the victim peeking outside of the window and was told that the defendant and the victim were the only two individuals at the house. When Hillhouse returned twenty minutes later, the defendant was still in his robe, and the victim was not wearing pants. The victim picked up a pair of underwear from the floor that were later tested, and it was determined that the defendant's sperm were on the crotch of the underwear. Rickels testified that the type of relationship a child

has with the perpetrator of the sexual abuse affects whether the child will disclose abuse. Although the victim denied having any sexual activity with the defendant to state officials, testimony at trial established that she told peers that he was the father of her child and that she "gave it up to him." Further, she described herself as "relieved" when she found out the defendant was not the father of her baby. The testimony at trial established that the victim and the defendant were very close and that the victim had a strong love for the defendant.

After a thorough review of the record, we are convinced that any rational trier of fact, viewing the evidence in the light most favorable to the State, could have found beyond a reasonable doubt, and to the exclusion of those reasonable hypotheses of innocence raised by the defendant at trial, all of the elements of aggravated rape and aggravated incest and the defendant's identity as the perpetrator of those offenses against the victim. The verdicts rendered against the defendant indicate that the jury rejected the defendant's claims of innocence and his explanation for the presence of his DNA on the victim's underwear. When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La. 1984). No such hypothesis exists in the instant case. Further, the verdicts rendered indicate that the jurors believed the testimony of Hillhouse and D.D. and discounted the trial testimony of the victim and the defendant. This court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Lofton, 96-1429 (La.App. 1st Cir. 3/27/97), 691 So.2d 1365, 1368, writ denied, 97-1124 (La. 10/17/97), 701 So.2d 1331. Additionally, in reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See State v. Calloway, 2007–2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam).

This assignment of error is without merit.[14]

---

[14] State v. Ciravola, No. 2015 KA 0032, 2015 WL 4657546, at *7-9 (La. App. 1st Cir. Aug. 5, 2015); State Rec., Vol. 4 of 8.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[15]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017). For the following reasons, it is clear that he has not done so.

As the Louisiana First Circuit Court of Appeal correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Moreover, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012).

Further, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law

---

[15] State v. Ciravola, 226 So. 3d 434 (La. 2017); State Rec., Vol. 6 of 8.

would impose a more demanding standard of proof.    Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 566 U.S. at 655 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

In the instant case, it is undisputed that petitioner is the victim's father and that the victim had vaginal sexual intercourse with at least one male while she was under the age of thirteen.  The dispute concerns whether petitioner was one of those sexual partners.  Prior to and at trial, both the victim and petitioner stated that he was not.

Nevertheless, the state introduced other evidence at trial in support of the charges, such as the fact that petitioner's semen was found inside the crotch of the victim's underwear after Hillhouse's visit to the residence (a visit during which petitioner and the victim were not wearing pants), as well as the victim's seeming admissions to D.D. and her apparent disappointment on learning that petitioner was not the baby's father.  The jury found that evidence sufficient to prove petitioner's guilt beyond a reasonable doubt.  Even if petitioner could now establish that the jury reached the *wrong* verdict, that alone would not warrant relief because "the Jackson inquiry does

not focus on whether the trier of fact made the *correct* guilt or innocence determination ….”

Herrera v. Collins, 506 U.S. 390, 402 (1993).  On the contrary, Jackson requires only that a jury’s

guilty verdict be a *“rational”* one.  Id.  As noted, in the instant case, the state courts expressly

determined that the jury’s verdict was rational.

 The question before this Court is whether the state court’s determination that the jury’s

verdict was rational was an *unreasonable* one.  As the United States Supreme Court has explained:

>  The opinion of the Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct.
> 2781, 61 L.Ed.2d 560 (1979), makes clear that it is the responsibility of the jury –
> not the court – to decide what conclusions should be drawn from evidence admitted
> at trial.  A reviewing court may set aside the jury’s verdict on the ground of
> insufficient evidence only if no rational trier of fact could have agreed with the jury.
> What is more, a federal court may not overturn a state court decision rejecting a
> sufficiency of the evidence challenge simply because the federal court disagrees
> with the state court.  The federal court instead may do so only if the state court
> decision was “objectively unreasonable.” Renico v. Lett, 559 U.S. ——, ——, 130
> S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>  Because rational people can sometimes disagree, the inevitable
> consequence of this settled law is that judges will sometimes encounter convictions
> that they believe to be mistaken, but that they must nonetheless uphold.

Cavazos v. Smith, 565 U.S. 1, 2 (2011); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir.

2019) (“The Supreme Court has repeatedly held that it is not enough to show the state court was

wrong.”).  Further, a state court’s decision denying a claim on the merits is considered

“unreasonable” only when it runs afoul of the law as set forth by the *United States Supreme Court*.

If the Supreme Court’s “cases give no clear answer to the question presented, let alone one in [the

petitioner’s] favor, it cannot be said that the state court unreasonably applied clearly established

Federal law.”  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets

omitted).

Petitioner has not identified – and this Court's independent research has not uncovered – a United States Supreme Court case with evidence analogous to that presented in the instant case in which the Supreme Court determined that the <u>Jackson</u> standard was unmet. Therefore, for this Court to make such a finding, the Court would be required to extrapolate from Supreme Court precedent and extend the law. That simply is not permitted. Rather, the Supreme Court has cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

<u>White v. Woodall</u>, 572 U.S. 415, 426 (2014) (citations and quotation marks omitted).

In summary, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was irrational. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## **B. Hearsay**

Petitioner claims that the trial court erred in allowing the introduction of hearsay testimony. On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> The defendant argues that the district court erred by allowing hearsay testimony. Specifically, the defendant complains that the court allowed Bankston

to testify as to what R.C. told her.  The defendant further contends that he was denied his right to confront R.C.

During Bankston's testimony, the prosecutor asked why she contacted DCFS and the Washington Parish Rape Crisis Center in relation to the victim's pregnancy after her initial report to each agency.  Bankston responded:

> One of the paraprofessionals at school came to me and a student had disclosed to her that she had seen [the victim] with her dad and another man at the Bogalusa parade and [the victim] was barefoot and all of that and she talked to her.  She said she asked her, "[C.B.—]".

Defense counsel objected to the comment as hearsay, and the district court sustained the objection.  The prosecutor told the witness that she could not repeat what was said and proceeded to ask Bankston who the potential suspect was based on the information that she received.  The defendant objected again, arguing that there was not a proper foundation.  The court ruled that the "witness can state what she said" when she contacted DCFS.  Bankston responded, "I contacted [DCFS] and told them that I had been given information that the [victim] had stated that [the defendant] was the father of the baby."  Defense counsel did not object to Bankston's statement.  By failing to enter a contemporaneous objection to the alleged erroneous admission of Bankston's testimony repeating the information given to her, the defendant failed to preserve the alleged error on appeal.  See La.Code Crim. P. art. 841A and La.Code Evid. art. 103A(1).  Moreover, Bankston's testimony regarding the victim's statement to R.C. was cumulative to that of Captain Sorrell, who also indicated that the victim made a similar disclosure to R.C.

As to the defendant's contention that he was denied his constitutional right of confrontation because he was unable to cross-examine R.C., we note that the defendant failed to lodge any contemporaneous objections on the grounds of a Crawford confrontation violation.[FN 6]  As such, the defendant has waived his right to raise these issues on appeal.  La.Code Crim. P. art. 841 A; La. Code Evid. art. 103A(1); see State ex rel. L.W., 2009-1898 (La.App. 1st Cir. 6/11/10), 40 So.3d 1220, 1227, writ denied, 2010-1642 (La. 9/3/10), 44 So.3d 708; State v. Young, 99-1264 (La.App. 1st Cir. 3/31/00), 764 So.2d 998, 1005.  This assignment of error is without merit.

> [FN 6]  Crawford v. Washington, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).[16]

---

[16] State v. Ciravola, No. 2015 KA 0032, 2015 WL 4657546, at *9-10 (La. App. 1st Cir. Aug. 5, 2015); State Rec., Vol. 4 of 8.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[17]

In its response in this proceeding, the state argues that this claim is procedurally barred from federal review. For the following reasons, the state is correct.

The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted). Where a lower court has rejected a claim on procedural grounds, later opinions upholding that decision are presumed to rely on the same grounds if reasons are not assigned. Id. ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground.").

As noted, in the last reasoned state court opinion addressing this claim, the Louisiana First Circuit Court of Appeal held that the claim was waived because there was no contemporaneous objection. The United States Fifth Circuit Court of Appeals has clearly held that Louisiana's contemporaneous objection rule is an independent and adequate state procedural rule. Duncan v. Cain, 278 F.3d 537, 541-43 (5th Cir. 2002). Therefore, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will

---

[17] State v. Ciravola, 226 So. 3d 434 (La. 2017); State Rec., Vol. 6 of 8.

result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something external to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Objective factors that can constitute cause include interference by officials that makes compliance with the state procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel, and ineffective assistance of counsel. Romero v. Collins, 961 F.2d 1181, 1183 (5th Cir. 1992). Here, petitioner has not argued, much less established, cause for this procedural default. "Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

In that petitioner has not met the "cause and prejudice" test, this claim is barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice." In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley, 243 F.3d at 220 (citations omitted). However, the United States Supreme Court has cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup v. Delo, 513 U.S. 298, 324 (1995). In the instant case, petitioner presents no new evidence whatsoever in support of a contention that he is actually innocent. Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

Accordingly, federal review of this claim is barred.

### C.  Excessive Sentences

Petitioner claims that his sentences are excessive. On direct appeal, the Louisiana First Circuit Court of Appeal denied that claim, holding:

> [T]he defendant contends that the district court erred in imposing excessive sentences. The defendant does not challenge the length of the individual sentences as excessive. Instead, he specifically argues that the consecutive, rather than concurrent, nature of the sentences renders them unconstitutionally excessive.
> At the time of sentencing, defense counsel stated that he would like to file a motion to reconsider sentence. The court denied the motion. The written motion to reconsider sentence states, in pertinent part, the following:
>
> 1.    The sentence is, on its face, constitutionally excessive;
>
> 2.    The interests of Justice require a less severe sentence;
>
> 3.    Defendant further adopts all reasons orally argued before the court at the time of sentencing and the ruling in State v. Dorthey, 623 So.2d 1276.
>
> Louisiana Code of Criminal Procedure article 881.1B requires a party who files a motion to reconsider sentence to state in the motion the specific ground on which the motion is based. A party is precluded from urging on appeal any ground which was not raised in the motion to reconsider. La.Code Crim. P. art. 881.1E. Thus, the defendant's motion to reconsider the sentence, on the ground that the sentence was "constitutionally excessive", was insufficient to preserve the claim he now raises on appeal that the district court erred by imposing consecutive sentences. See State v. Riles, 2006-1039 (La.App. 1st Cir. 2/14/07), 959 So.2d 950, 955-56, writ denied, 2007-0695 (La. 11/2/07), 966 So.2d 599.
> Moreover, if we were to consider this claim, we would find it baseless. The basis for the defendant's argument is that the district court abused its discretion by imposing consecutive sentences because there was no evidence that the offenses occurred over a period of time. He complains that the only evidence introduced at

trial in support of that assertion was the "opinion" of Captain Sorrell that the victim "was socialized that this is acceptable behavior."

Concurrent rather than consecutive sentences are the general rule for multiple convictions arising out of a single course of criminal conduct. See La.Code Crim. P. art. 883. However, even if convictions arise out of a single course of conduct, consecutive sentences are not necessarily excessive; other factors must be taken into consideration in making this determination. For instance, consecutive sentences are justified when the offender poses an unusual risk to the safety of the public. See State v. Crocker, 551 So.2d 707, 715 (La.App. 1st Cir. 1989). Some other factors include the defendant's criminal history, the dangerousness of the offense, the viciousness of the crimes, the harm done to the victim, and the potential for the defendant's rehabilitation. State v. Parker, 503 So.2d 643, 646 (La.App. 4th Cir. 1987). Additional factors that may serve as justification for consecutive sentences include multiplicity of acts and lack of remorse. State v. Lewis, 430 So.2d 1286, 1290 (La.App. 1st Cir.), writ denied, 435 So.2d 433 (La. 1983). See also State v. Badeaux, 2001-406 (La.App. 5th Cir. 9/25/01), 798 So.2d 234, 241, writ denied, 2001-2965 (La. 10/14/02), 827 So.2d 414 (wherein the Fifth Circuit held that the district court did not abuse its discretion by imposing consecutive sentences on a defendant who was convicted of sexual battery and indecent behavior with a juvenile. Although the events therein occurred on the same day as part of a common scheme or plan, and the offenses were part of the same transaction, the district court noted the severity of the crimes, vulnerability of the child victim, and the defendant's use of his position as an adult neighbor).

Prior to imposing the defendant's sentence, the district court stated that it heard this trial and saw "the enormous amount of damage that this victim has suffered[.]" Citing Louisiana Code of Criminal Procedure article 894.1, the court found that there was an undue risk that during a period of suspended sentence or probation, the defendant would commit another crime; that the defendant was in need of correctional treatment or custodial environment that could be provided most effectively by his commitment to an institution, and that a lesser sentence would deprecate the seriousness of the offenses. The court found that the defendant knew or should have known that the victim was particularly vulnerable and incapable of resistance due to extreme youth, but he "advanced and connected." See La.Code Crim. P. art. 894.1A(1), A(2), A(3) and B(2).

Based on those findings, the district court sentenced the defendant for his aggravated incest conviction to a term of fifty years imprisonment at hard labor with the first twenty-five years to be served without the benefit of parole, probation, or suspension of sentence. See La. R.S. 14:78.1 (prior to its repeal). For his aggravated rape conviction, the defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. See La. R.S. 14:42. Further, the court made a specific finding that "this was one of the most egregious and worse offenses that have continued over a period of time. And for that reason, I impose the fifty-year sentence ... consecutive to that imposed in count two."

22

We have reviewed the district court's reasons and the entire record before us, and we find no abuse of the district court's broad sentencing discretion in imposing consecutive sentences considering the egregious nature of the offenses and amount of damage suffered by the victim. Contrary to the defendant's claim that sufficient justification is lacking, the consecutive sentences are adequately justified for these particular crimes and for this particular defendant, who abused a position of trust and responsibility to his daughter without any regard for the lifelong harm that his conduct may cause the young victim. Accordingly, this assignment of error is without merit.[18]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[19]

In its response in this proceeding, the state argues that this claim is also procedurally barred from federal review. Again, the state is correct.

In the last reasoned state court opinion addressing this claim, the Louisiana First Circuit Court of Appeal held that the claim was waived pursuant to La. Code Crim. P. art. 881.1(E), because the issue was not properly preserved for appellate review. That provision of Louisiana law is an independent and adequate state procedural rule. Odis v. Vannoy, Civ. Action No. 18-9877, 2019 WL 6716956, at *5 (E.D. La. Dec. 10, 2019) ("Federal courts have repeatedly held that La. Code Crim. P. art. 881.1(E) and related state case law are regularly and evenhandedly applied by the Louisiana courts and therefore adequate to bar federal review of Petitioner's excessive sentence claim."); see also Robinson v. Cain, Civ. Action No. 15-1551, 2016 WL 6902114, at *7 (E.D. La. Oct. 25, 2016), adopted, 2016 WL 6892870 (E.D. La. Nov. 23, 2016);

---

[18] State v. Ciravola, No. 2015 KA 0032, 2015 WL 4657546, at *10-12 (La. App. 1st Cir. Aug. 5, 2015); State Rec., Vol. 4 of 8.
[19] State v. Ciravola, 226 So. 3d 434 (La. 2017); State Rec., Vol. 6 of 8.

Young v. Travis, No. 07-3542, 2011 WL 494811, at *7 (E.D. La. Jan. 13, 2011), adopted, 2011 WL 494802, at *1 (E.D. La. Feb. 4, 2011).[20]

In his reply to the state's response in this proceeding, petitioner appears to suggest that the the "cause" for the default of this claim was that his counsel was ineffective for failing to file an adequate motion for reconsideration of sentence.[21]    However, that argument fails because petitioner has never asserted an independent claim in the state courts arguing that his counsel was ineffective in that respect.  The United States Supreme Court has held:

> Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice.  Carrier, 477 U.S. [478,] 488-489, 106 S.Ct. 2639[, 91 L. Ed. 2d 397 (1986)].  Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.  Ibid.  In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim.  And we held in Carrier that the principles of comity and federalism that underlie our longstanding exhaustion doctrine – then as now codified in the federal habeas statute, see 28 U.S.C. §§ 2254(b), (c) – require *that* constitutional claim, like others, to be first raised in state court.  "[A] claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default."  Carrier, *supra*, at 489, 106 S.Ct. 2639.

Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).

Petitioner argues that he is nevertheless still entitled to review based on Martinez v. Ryan, 566 U.S. 1 (2012), and its progeny.  He is incorrect.

Martinez held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective

---

[20] The fact that the claim was alternatively found to be meritless is immaterial.  "A state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim." Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).
[21] Rec. Doc. 14, p. 7.

assistance at trial." <u>Id.</u> at 9.  Further, the United States Supreme Court has expressly held that the <u>Martinez</u> exception applies only to that one type of claim:  "[The <u>Martinez</u>] exception treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a *single claim – ineffective assistance of trial counsel* – in a single context – where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal."  <u>Davila v. Davis</u>, 137 S. Ct. 2058, 2062-63 (2017) (emphasis added).  Because <u>Martinez</u> applies only to defaulted claims of *ineffective assistance of trial counsel*, it simply does not apply to petitioner's *excessive sentence* claim.[22]

Because petitioner has not established cause for the procedural default of his excessive sentence claim, and because he presented no new evidence demonstrating that he is actually innocent, the claim is likewise procedurally barred from federal review.

### D.  Denial of Appellate Review

Petitioner argues that that his "constitutional rights to appellate review and a complete record of the trial proceedings have been violated."[23]  In the post-conviction proceedings, the state district court denied that claim on the merits, holding:

> Contrary to Applicant's assertions in his … claim, his case <u>was</u> submitted for appellate review.  His further assertion that he is constitutionally guaranteed a complete transcript of the proceedings is also incorrect.  <u>Art. I § 19 of the Louisiana Constitution</u> provides for the "right of judicial review based upon a complete

---

[22] Out of an abundance of caution, the Court notes that <u>Martinez</u> also does not save petitioner's proffered claim that his counsel was ineffective for failing to file an adequate motion for reconsideration of sentence.  That claim was not rejected by the state courts as *procedurally defaulted*; rather, it is *unexhausted* because it was never presented to the state courts at all.  Therefore, again, <u>Martinez</u> simply does not apply.  <u>See</u> <u>Abdul v. Tanner</u>, Civ. Action No. 17-9108, 2019 WL 1325953, at *7 (E.D. La. Mar. 25, 2019) ("Under <u>Martinez</u>, when a federal habeas petitioner brings a claim for ineffective assistance of trial counsel that is procedurally defaulted, he can demonstrate cause for that default by showing that his post-conviction counsel (or lack of counsel) was ineffective in failing to raise the claim on collateral review.  Here, Petitioner's claim that trial counsel was ineffective … has not been presented to the state courts.  Therefore, that claim has not been procedurally defaulted, and the <u>Martinez</u> exception does not apply." (footnote omitted)).

[23] Rec. Doc. 1-2, p. 19.

record." That is, the complete record is for the reviewing court, not the defendant. The First Circuit reviewed the complete record of Defendant's case, after which they affirmed the jury's verdict.

State v. Holmes, 543 So. 2d 1365, 1365 (La. Ct. App. 1989) cited by Applicant has no application to the case at bar as it concerned a guilty plea and that defendant's right to his Boykin transcript, not a trial transcript. Likewise in State v. Porter, 2013-0357 (La. App. 4 Cir. 10/8/14), 151 So. 3d 871, 882, writ denied, 2014-2353 (La. 9/11/15), 176 So. 3d 1037, the issue of lack of portions of the trial record was urged by counsel for purposes of review by the appellate court, and not by the defendant pro se, for post-conviction relief.

This court has been informed that the First Circuit routinely offers criminal defendants a copy of the record during the briefing period so as to enable them to file a pro se brief. In this case, Defendant asserts that the Legal Programs Department of the Louisiana State Penitentiary refused him access to the record during that time period. (Memo. Pg. 8) If that is the case, Defendant must urge such a claim under the provisions of La. R.S. 15:1171, et seq., the Corrections Administrative Remedy Procedure Act ("CARP"). If it is denied by the Department of Corrections, review should be sought from the First Circuit and not this court.[24]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons,[25] and the Louisiana Supreme Court thereafter denied the claim as "repetitive," citing La. Code Crim. P. art. 930.4.[26]

In its response in this proceeding, the state notes that the intended meaning of the Louisiana Supreme Court's use of the term "repetitive" in this instance is unclear, making it impossible to determine whether that court accurately and legitimately imposed a procedural bar with respect to this claim (as well as several other claims discussed later in this opinion). Due to that uncertainty, the state declines to argue that the claim is procedurally barred and instead suggests that this Court should review the claim *de novo*.[27] The undersigned agrees.[28]

---

[24] State Rec., Vol. 5 of 8, Order dated March 22, 2018, pp. 5-6.

[25] State v. Ciravola, No. 2018 KW 0509, 2018 WL 2714915 (La. App. 1st Cir. June 4, 2018); State Rec., Vol. 7 of 8.

[26] State v. Ciravola, 271 So. 3d 1266 (La. 2019); State Rec., Vol. 8 of 8.

[27] Rec. Doc. 13, p. 10.

[28] A federal court may choose to look past a possible procedural default if a claim can be resolved more easily on the merits. See, e.g., Swain v. Thaler, 466 F. App'x 393, 397 n.2 (5th Cir. 2012); Adams v. Thaler, 421 F. App'x 322, 336 (5th Cir. 2011); Lande v. Cooper, Civ. Action No. 11-3130, 2013 WL 5781691, at *26 n.68 (E.D. La. Oct. 25,

Turning to the merits of the claim, the Court finds that it should be denied for the following reasons.

To the extent that petitioner is arguing that he was denied appellate review of his convictions and sentences, that is simply untrue. As noted, his state criminal judgment was considered and affirmed on direct review.[29]

To the extent that he is arguing that he was not personally provided with the opportunity to review the transcripts during that direct appeal process, that fact, even if true, violates no federally protected right. Because he was represented by counsel in the direct appeal, and because counsel had access to the transcripts and presumably found them to be adequate (in that no objection was raised as to their adequacy), petitioner's federal constitutional rights were not violated in this respect. Hooks v. Roberts, 480 F.2d 1196, 1198 (5th Cir. 1973) ("If a defendant is represented by counsel on appeal who has a copy of the trial transcript, there is no constitutional requirement that the defendant also be provided with physical custody of a copy of the transcript."); see also Roper v. Rader, Civ. Action No. 13-0572, 2015 WL 3605728, at *5 (M.D. La. May 27, 2015), adopted, 2015 WL 3607575 (M.D. La. June 8, 2015); Rosado v. Unger, No. 11 Civ. 3747,

---

2013); Brian R. Means, Federal Habeas Manual § 9B:5 (2019) ("[W]here the procedural default question is relatively complicated or when relief is due to be denied even if claims are not procedurally barred, a federal court is authorized to skip over the procedural default issue and proceed to deny the claim on the merits.").

　　When a federal habeas court elects to review the merits of claims that may have been denied by the state courts on procedural grounds, those claims should be reviewed de novo. See Miller v. Johnson, 200 F.3d 274, 281 n.4 (5th Cir. 2000) ("Review is de novo when there has been no clear adjudication on the merits."); Brian R. Means, Federal Habeas Manual § 3:7 (2019) ("In the absence of a state-court merits adjudication, the federal claim is reviewed de novo by the federal court in habeas corpus proceedings."). This is permissible because "an applicant who is not entitled to relief under a de novo standard of review necessarily will not be entitled to relief under the less favorable standard of AEDPA deference." Lewis v. Thaler, 701 F.3d 783, 787 n.1 (5th Cir. 2012); accord Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can … deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).").

[29] State v. Ciravola, No. 2015 KA 0032, 2015 WL 4657546 (La. App. 1st Cir. Aug. 5, 2015), writ denied, 226 So. 3d 434 (La. 2017); State Rec., Vols. 4 and 6 of 8.

2012 WL 5871607, at *9-10 (S.D.N.Y. May 4, 2012), adopted, 2012 WL 5871606 (S.D.N.Y. Nov. 20, 2012); Richardson v. Quarterman, Civ. Action No. H-081612, 2008 WL 5056724, at *6 (S.D. Tex. Nov. 20, 2008).

Lastly, to the extent that petitioner is arguing that the failure to provide him copies of the transcripts violated his rights under state law, the Court need not – and does not – reach that issue. Even if state law guarantees such a right, and even if that right was in fact violated, that violation cannot be remedied in this proceeding. Federal habeas corpus relief may be granted "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); see also 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless … [h]e is in custody in violation of the Constitution or laws or treaties of the United States …."). Accordingly, mere violations of state law would not suffice. See Engle v. Isaac, 456 U.S. 107, 119 (1983).

### E.  Prosecutorial Misconduct

Petitioner argues that the prosecutor engaged in misconduct by making inappropriate and prejudicial comments during his opening statement and closing arguments. Petitioner states that he cannot quote the exact remarks made by the prosecutor because he does not have a copy of the transcript, but, based on his memory, he paraphrases the comments as follows:

1.    The jury "needed to protect society from 'Predators' such as Mr. Ciravola."

2.    "Mr. Ciravola had his own daughter too scared to testify to the truth of the matter."

3.    "This man has destroyed enough lives."

4.    "What kind of man gets his own twelve-year old daughter pregnant?"

5.    "[T]hink how you would feel if you lived on this street."

28

6.    "This man has gotten away with breaking the law long enough.  It's time to him

[sic] he can't do that any more."

In the post-conviction proceedings, the state district court denied this claim on the merits,

holding:

> The quotations offered in support of Defendant's … claim do not appear in
> the transcript as being made by the prosecutor.  Nor were any similar objectionable
> statements or those concerning "the remaining residents on that particular street"
> made either during the State's Opening Statement or Closing Argument.  Before
> the trial commenced, DNA evidence established that the father of the victim's child
> was not the Defendant, but a different family member.  It defies logic that the State
> would have made the obviously erroneous statement alleged about getting "his
> twelve-year old daughter pregnant."  Once again, merely arguing "I think he said
> this" does not satisfy the particularized need of this defendant in this case so as to
> require the State to finance Defendant's "combing" of the record.[30]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application

without assigning additional reasons,[31] and the Louisiana Supreme Court thereafter denied the

claim as "repetitive," citing La. Code Crim. P. art. 930.4.[32]

Once again, the state notes the vagueness of the Louisiana Supreme Court's opinion makes

it impossible to determine whether that court accurately and legitimately imposed a procedural bar

with respect to this claim.  Therefore, the state again declines to argue that the claim is procedurally

barred and suggests that this Court should review the claim *de novo*.[33]  The Court agrees.  Further,

the Court has reviewed the opening statement, initial closing argument, and rebuttal closing

argument,[34] and, like the state district court, finds that neither those comments nor any even

---

[30] State Rec., Vol. 5 of 8, Order dated March 22, 2018, pp. 4-5.
[31] State v. Ciravola, No. 2018 KW 0509, 2018 WL 2714915 (La. App. 1st Cir. June 4, 2018); State Rec., Vol. 7 of 8.
[32] State v. Ciravola, 271 So. 3d 1266 (La. 2019); State Rec., Vol. 8 of 8.
[33] Rec. Doc. 13, p. 10.
[34] State Rec., Vol. 3 of 8, trial transcript, pp. 343-56; State Rec., Vol. 4 of 8, trial transcript, pp. 649-58 and 669-85.

remotely similar comments were made therein by the prosecutor.  Accordingly, the factual basis of petitioner's claim is meritless, and the claim must therefore be denied.

### F.  Ineffective Assistance of Counsel at Trial and on Appeal

Petitioner argues that that he received ineffective assistance of counsel both at trial and on appeal.  In the post-conviction proceedings, the state district court denied that claim on the merits, holding:

> The Supreme Court in <u>Strickland v. Washington</u> 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) set forth the standard for analysis of an ineffective assistance of counsel claim as follows:
>
>> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
>
> In terms of the prejudice prong, defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Strickland</u>, 466 U.S. at 694, 104 S. Ct. 2068. "The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong."  <u>Ransom v. Johnson</u>, 126 F. 3d 716, 721 (5th Cir. 1997), <u>cert. denied</u>, 522 U.S. 944, 118 S. Ct. 361, 139 L. Ed. 2d 281 (1997).
> "Courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and scrutiny of counsel's performance must be highly deferential."  <u>Rose v. Flores-Ortego</u>, 528 U.S. 470, 120 S. Ct. 1029, 1034-35, 145 L. Ed. 2d 985 (2000).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  See Michel v. Louisiana, supra, 350 U.S., at 101, 76 S.Ct., at 164.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.  See Goodpaster, The Trial for Life:  Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).

An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  Cf. United States v. Morrison, 449 U.S. 361, 364-365, 101 S.Ct. 665, 667-668, 66 L.Ed.2d 564 (1981).  The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.  Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution.

As to his appellate counsel, Defendant argues that she "only listed two assignments of error" and ignored his "numerous correspondences" noting "meritorious issues that could have been raised on appeal."  While Defendant cites numerous cases allegedly supporting his legal argument on this claim, he has failed to identify what issues should have been raised.  His argument that counsel failed to urge the First Circuit to review the case for patent error is also misplaced.  That body routinely, without request, reviews every case for patent error.  There is no merit to this claim.

"It is deficient performance on behalf of counsel not to investigate and form a viable defense."  This is a correct statement of the law.  However, Defendant fails to provide any information about those facts or witnesses that he maintains would have won the day.  "A defendant who asserts a claim of ineffective assistance counsel based on a failure to investigate must allege with specificity what the investigation would have revealed and how it would have altered the outcome of a trial.  General statements and conclusory charges will not suffice."  State v. Casteneda, 94-1118 (La. App. 1st Cir. 6/23/95), 658 So. 2d 297, 306.

No one saw the Defendant and victim engaging in sexual relations.  The victim, C.B., consistently denied having sex with her father.  She did so when questioned by the police, her mother, on the CAC tapes and at trial.  Defendant testified at trial and denied the allegations.  However, despite the denial by both parties to the alleged acts, the jury found the testimony of other persons who were not eyewitnesses to be more credible.  As to counsel's alleged failure to object to impermissible comments by the State in Open and Close, since the court has found no such impermissible statements, counsel was not ineffective in failing to lodge objections.

State v. Myles, 389 So. 2d 12, 28-31 (La. 1980) is not analogous to the case at bar as Defendant argues. Defendant's trial counsel put on witnesses in his behalf. He cross-examined the State's witnesses vigorously and lodged several objections during trial. Further, he suggested reasonable explanations for the physical evidence as well as different interpretations of the victim's alleged statements made to friends and classmates. Counsel's cross-examination of the two hearsay witnesses provided reasonable alternative interpretations of the victim's statements which did not incriminate the defendant for the allegations made by the State.

Defendant also argues that his trial counsel was ineffective for his failure to retain and seek public funding to retain an independent child sexual abuse expert. "Counsel should obtain independent experts for consultation and to help in understanding the scientific and technical information presented by the State." The State did not offer any expert testimony in the field of child sexual abuse. Therefore, there was no such evidence offered by the State that required rebuttal or explanation by the defense. Counsel was therefore not ineffective for not retaining or seeking funding for a child sexual abuse expert.

One of the most inculpatory items of evidence against Defendant was the presence of his DNA in the seminal stain on the inside crotch area of the victim's underwear. At trial, counsel offered a reasonable explanation for the presence of that evidence through the testimony of Defendant and the victim as well as cross-examination of the State's witnesses.

Contrary to Defendant's assertion, the case at bar was not one of delayed disclosure or an accusation by the victim of the charges brought. Nor was it about "consistent with" testimony. There was no question that the victim had sexual relations. She was pregnant. Both the victim and Defendant, the alleged participants in the charged sexual contact consistently denied that contact. The "rape kit" evidence was negative for any sexual contact between the victim and Defendant. DNA evidence established that Defendant was not the father of the victim's child. Both the victim and the father of her child admitted to having had sexual relations.[35]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons.[36] The Louisiana Supreme Court thereafter also denied the claims, succinctly stating: "Applicant fails to show that he received ineffective assistance of

---

[35] State Rec., Vol. 5 of 8, Order dated March 22, 2018, pp. 6-10.
[36] State v. Ciravola, No. 2018 KW 0509, 2018 WL 2714915 (La. App. 1st Cir. June 4, 2018); State Rec., Vol. 7 of 8.

counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[37]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claim on the merits unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v. Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). Further, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

---

[37] <u>State v. Ciravola</u>, 271 So. 3d 1266 (La. 2019); State Rec., Vol. 8 of 8.

Harrington v. Richter, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting Strickland's high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult.  *The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Id. at 105 (emphasis added; citations omitted).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).

In the instant case, the state courts correctly identified Strickland as the clearly established federal law governing ineffective assistance of counsel claims.  Further, as they correctly noted, Strickland requires that a petitioner make two showings to prevail on such a claim:  (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. Strickland, 466 U.S. at 697.  The petitioner bears the burden of proof and "must demonstrate, by

a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice

35

occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.  On the other hand, to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. Briseno v. Cockrell, 274 F.3d 204, 207 (5th Cir. 2001); see also Smith v. Robbins, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  Briseno, 274 F.3d at 210.

Mindful of these principles and the AEDPA's deferential standards of review, the Court finds that that relief is not warranted with respect to petitioner's ineffective assistance of counsel claims for the following reasons.

### 1.  Trial Counsel

Petitioner first contends that trial counsel was ineffective for failing to object to the prosecutor's improper comments during the opening statement and closing arguments.  However, as previously explained *supra*, the transcript shows that the prosecutor simply did not make the comments alleged by petitioner.  Accordingly, there was no basis for an objection, and, therefore, this contention necessarily fails.

Petitioner next contends that trial counsel was ineffective for failing to hire or consult with "an Independent Child Sexual Abuse Expert" (or to request the trial court to appropriate funds for that purpose).  Petitioner has not explained with specificity why such an expert was needed or how it would have aided the defense.  In his discussion of the claim, he seems to suggest that the state

presented expert testimony "to discredit the credibility of the alleged victim"[38] and that the defense needed its own rebuttal expert on that point.  Neither of those suggestions is accurate.

Petitioner is presumably referring to the testimony of JoBeth Rickels,[39] who testified as an expert in the field of forensic interviewing.  During her testimony, Rickels at no point tried to discredit the victim.  On the contrary, she was simply asked if victims always disclose the fact that they have been abused, and she answered no, explaining:

> If it is sexual abuse, that's something that's embarrassing.  They may have been told not to tell and they're afraid of getting in trouble.  They may be afraid that someone they really love will get in trouble.  They feel it's their fault.  There are a number of reasons why – you know, people just don't talk about that or say that something happened, especially if it's happened more than one or two times.  They they'll really – you know, they'll have this guilt like it's their fault and they may not disclose.[40]

The prosecutor then asked whether "the type of relationship that a child has with his or her perpetrator affect their willing to disclose," and Rickels answered yes, explaining:

> They may have a very good relationship with someone whether it be a family member or friend and it just may be one of those things that they don't like this part, but the rest of the relationship is great and it's someone they love or someone they like to be with, so it's very conflicted.[41]

However, during the following exchange during cross-examination, defense counsel was then able to effectively rebut the foregoing by having Rickels concede that it is also possible that a child sometimes does not disclose abuse for a simpler reason, namely that no abuse in fact occurred:

---

[38] Rec. Doc. 1-2, p. 36.
[39] This witness's surname appears as both "Rickels" or "Rickles" in the state court record.  The Louisiana First Circuit Court of Appeal used the former spelling; for the purposes of consistency, this Court will do the same.
[40] State Rec., Vol. 3 of 8, trial transcript, p. 542.
[41] Id. at pp. 542-43.

Q.        … You testified at the behest of [the prosecutor] that children cannot report for years maybe, and various reasons why they may not report, embarrassment or wanting to protect someone?

A.        Right.

Q.        Is it also true that children don't report because nothing happened?

A.        True.  That's true.

Q.        So that is also a reason why a child may say nothing happened because nothing actually happened?

A.        Yes, sir.

Q.        In your 12 years' experience of doing these interviews, has there been an occasion where a child has not actually disclosed during one of your interviews?

A.        Yes, sir.

Q.        And you thought they were being truthful?

A.        Yes, sir.

Q.        And that the prosecution continued on to prosecute?

A.        Yes, but I don't know the whole investigation.[42]

Defense counsel further got Rickels to concede that she had no way of knowing whether the victim in this case was truthful during her interview:

Q.        Is there any way you can ascertain the truthfulness of [C.B.]'s interview?

A.        No, sir, not to be completely 100 percent sure either way.

Q.        Either way?

A.        Either way.[43]

---

[42] Id. at 545-46.
[43] Id. at p. 548.

Because defense counsel was able to extract the foregoing admissions from the state's own expert witness, there is no basis for this Court to conclude that he performed deficiently in failing to make the same points in an arguably less-effective manner, i.e. eliciting similar testimony from an expert obviously aligned with the defense. Moreover, petitioner has also failed to make any showing whatsoever that prejudice resulted, i.e. that there is a reasonable probability that the result of the proceeding would have been different if only counsel had secured an expert. Accordingly, this contention fails on both prongs of the <u>Strickland</u> analysis.

## 2. Appellate Counsel

Petitioner also contends that appellate counsel was ineffective. With respect to such claims, it must be remembered that appellate counsel "is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)." <u>West v. Johnson</u>, 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983). Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions." <u>Id</u>. at 753.

In the instant case, appellate counsel raised three assignments of error on direct appeal: (1) there was insufficient evidence to support petitioner's convictions; (2) the district court erred by allowing hearsay evidence; and (3) petitioner's sentences were excessive. "When, as here, counsel files a merits brief, a [petitioner] generally must show that 'a particular nonfrivolous issue was clearly stronger than issues counsel did present.'" <u>Dorsey v. Stephens</u>, 720 F.3d 309, 320 (5th Cir.

2013) (quoting <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000)).  In the instant case, however, petitioner has failed to identify a single "particular nonfrivolous issue" counsel failed to raise, much less show that that issue (whatever it may have been) was "clearly stronger" than the claims actually asserted.[44]  Therefore, this claim necessarily fails.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He clearly has not made that showing in the instant case.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

### G.  Number of Peremptory Challenges

Petitioner argues that his rights were violated when the prosecutor was permitted to use thirteen peremptory challenges, rather than only the twelve allowed under state law.[45]  In the post-conviction proceedings, the state district court denied that claim on the merits, holding:  "[T]he record establishes that the State used only the permitted twelve peremptory challenges and not

---

[44] The closest petitioner comes is to suggest that counsel should have asked the Louisiana First Circuit Court of Appeal to review the record for any patent errors.  However, not only does this suggestion fail to qualify as a "particular nonfrivolous issue," such a request is unnecessary.  Such review is automatic.  <u>State v. Kelly</u>, 195 So. 3d 449, 453 (La. 2016) ("Louisiana courts have long screened appeals for patent error.  <u>See, e.g.</u>, <u>State v. Behan</u>, 20 La. Ann. 389 (1868).  Currently, in accordance with La.C.Cr. P. art. 920, all appeals are routinely reviewed for errors patent on the face of the record."); <u>State v. Martin</u>, 607 So. 2d 775, 788 (La. App. 1st Cir. 1992) ("An assignment of error requesting patent error review is unnecessary, as this Court routinely reviews the record for errors patent, whether or not such a request is made by a defendant.  See LSA-C.Cr.P. art. 920(2)."). <u>See also</u> <u>Brown v. Warden, Louisiana State Penitentiary</u>, Civ. Action No. 11-cv-0578, 2014 WL 4302558, at *8 (W.D. La. Aug. 29, 2014).  Moreover, it is obvious that the Court of Appeal did in fact conduct such a review in this case, in that it identified a patent error regarding the sentence.  <u>See</u> <u>State v. Ciravola</u>, No. 2015 KA 0032, 2015 WL 4657546, at *12 (La. App. 1st Cir. Aug. 5, 2015); State Rec., Vol. 4 of 8.

[45] <u>See</u> La. Code Crim. P. art. 799 ("In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant. In all other cases, each defendant shall have six peremptory challenges, and the state six for each defendant.").

thirteen.  The claim that the judge, two experienced trial attorneys, the Clerk of Court and the court's other personnel <u>ALL</u> would ignore the statutory limit of challenges provided for in <u>CCrP Art 799</u> is unsubstantiated."[46]  The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons,[47] and the Louisiana Supreme Court thereafter denied the claim as "repetitive," citing La. Code Crim. P. art. 930.4.[48]

Once again, the state notes the vagueness of the Louisiana Supreme Court's opinion makes it impossible to determine whether that court accurately and legitimately imposed a procedural bar with respect to this claim.  Therefore, the state again declines to argue that the claim is procedurally barred and suggests that this Court should review the claim *de novo*.[49]  The Court agrees.  Further, the Court has reviewed the state court record, and, like the state district court, finds that the state exercised only twelve peremptory challenges.[50]  In the first panel, the state used peremptory challenges to excuse seven individuals:  Amy Ball; Connor Cooley; Travis Patterson; Daniel Thompson; Clarence Myers; Randy King; and Daniel Lambert.  In the second panel, the state then used peremptory challenges to excuse five additional individuals:  Marvin Austin; Christopher Magee; Billy Wood; Charles Piggott; and Jameka Johnson.[51]  Accordingly, the factual basis of petitioner's claim is meritless, and the claim must therefore be denied.

### H.  Discriminatory Jury Selection

Lastly, petitioner states:

---

[46] State Rec., Vol. 5 of 8, Order dated March 22, 2018, p. 3.
[47] <u>State v. Ciravola</u>, No. 2018 KW 0509, 2018 WL 2714915 (La. App. 1st Cir. June 4, 2018); State Rec., Vol. 7 of 8.
[48] <u>State v. Ciravola</u>, 271 So. 3d 1266 (La. 2019); State Rec., Vol. 8 of 8.
[49] Rec. Doc. 13, p. 10.
[50] Based on his reply to the state's response in this matter, it appears that even petitioner now concedes that his allegation was factually erroneous.  Rec. Doc. 14, p. 24.
[51] State Rec., Vol. 1 of 8, minute entry dated July 7, 2014.

Mr. Ciravola is also of the opinion that potential jurors were excluded because of their race and gender, mainly, African Americans. Mr. Ciravola believes that there were objections made during each of these important stages of the trial (if no objection was lodged, them [sic] Mr. Ciravola was denied effective assistance of counsel). Mr. Ciravola contends that the exclusion of jurors for reason of their race is a violation of the Fourteenth Amendment to the United States Constitution.[52]

In the post-conviction proceedings, the state district court denied that claim on the merits, holding:

> Defendant's … claim that the State engaged in improper jury selection based on race or gender is made without any particularity or support. While the record reveals the gender of the jurors in the panel for voir dire examination, it is silent on the race of each individual juror selected or excused.
>
> Furthermore, Defendant offers no suggestion as to what would be the proper composition of a non-discriminatorily selected jury, representative of the voters of Washington Parish. Since this claim offers no detail, this court would be hard pressed to decipher whether the complaint is to an excess or deficiency in a certain race or gender in the chosen panel. Regardless of which method of jury analysis Defendant urges is correct, either "comparative analysis" or "absolute disparity," his analysis needs to begin with the composition of the entire population and not with a composition of the jury actually selected. He has offered no such information. Therefore, the court finds Defendant's … claim[ ] to be without merit.[53]

The Louisiana First Circuit Court of Appeal then denied petitioner's related writ application without assigning additional reasons,[54] and the Louisiana Supreme Court thereafter denied the claim as "repetitive," citing La. Code Crim. P. art. 930.4.[55]

Once again, the state notes the vagueness of the Louisiana Supreme Court's opinion makes it impossible to determine whether that court accurately and legitimately imposed a procedural bar

---

[52] Rec. Doc. 1-2, p. 40. This Court notes that the Equal Protection Clause forbids prosecutors from challenging prospective jurors sole on account of their race, Batson v. Kentucky, 476 U.S. 79 (1986), or gender, J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994).

[53] State Rec., Vol. 5 of 8, Order dated March 22, 2018, pp. 3-4.

[54] State v. Ciravola, No. 2018 KW 0509, 2018 WL 2714915 (La. App. 1st Cir. June 4, 2018); State Rec., Vol. 7 of 8.

[55] State v. Ciravola, 271 So. 3d 1266 (La. 2019); State Rec., Vol. 8 of 8.

with respect to this claim.  Therefore, the state again declines to argue that the claim is procedurally barred and suggests that this Court should review the claim *de novo*.[56]  The Court agrees.

Petitioner has failed his burden of proof with respect to this claim.  The claim is entirely conclusory, in that petitioner has identified no prospective juror who was improperly excused by the prosecutor on the basis of race or gender.  Moreover, defense counsel made no Batson challenges during the voir dire, and the record does not reveal a basis for an inference of discrimination.  Relief is not warranted where, as here, a petitioner's "allegation that Batson was violated is wholly conclusory, unsupported and unsubstantiated by anything in the record." Griffin v. Director, TDCJ-CID, Civ. Action No. 6:06cv256, 2007 WL 1655330, at *9 (E.D. Tex. June 7, 2007).

To the extent that petitioner is alternatively arguing that counsel was ineffective for failing to make a Batson challenge, that argument fares no better.  Because he has not presented evidence showing that there was in fact a basis for a Batson challenge, he cannot meet his burden to prove that counsel was ineffective for failing to make such a challenge.  See, e.g., Dennis v. Vannoy, Civ. Action No. 16-6889, 2017 WL 9855222, at *15 (E.D. La. June 2, 2017), adopted, 2018 WL 3417872 (E.D. La. July 12, 2018); Stogner v. Cain, Civ. Action No. 12-2703, 2013 WL 2444667, at *19 (E.D. La. June 4, 2013); accord Bell v. Director, TDCJ-CID, No. 03-36, 2005 WL 2977771, at *6 (E.D. Tex. Nov. 2, 2005) ("[T]here is nothing in the record to support the Petitioner's allegation that a particular juror was improperly struck.  From the record, it is not possible to draw a reasonable inference of purposeful discrimination as required by Batson.  Petitioner has provided no proof of his allegation.  The Petitioner's claim is a conclusory allegation not supported by the

---

[56] Rec. Doc. 13, p. 10.

record.  Conclusory allegations and bald assertions are insufficient to support a petition for a writ of habeas corpus.").

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Warren Ciravola be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this _____4th_____ day of February, 2020.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**